# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

CHRISTINA BROWN,

    Plaintiff,

    v.                                                      2:24-CV-125

MICHAEL GONZALEZ,

    Defendant.

## ORDER

Before the Court is Defendant Michael Gonzalez's motion to dismiss Plaintiff Christina Brown's complaint. Dkt. No. 10. The parties have fully briefed the motion, and it is ripe for review. Dkt. Nos. 10, 16, 17, 19. The Court heard oral argument on May 28, 2025. Dkt. No. 18. For the reasons stated below, Defendant's motion is **GRANTED.**

## BACKGROUND

### I.    The Altercation at Outerbanks

On the evening of Thanksgiving Day, November 24, 2022, Plaintiff Christina Brown went to the Outerbanks Sports Bar and Grill in Kingsland, Georgia, to sing karaoke. Dkt. No. 1 ¶¶ 9-10. Plaintiff received poor service during her several hours at the bar and eventually got into a verbal argument with the bar owner. Id. According to Plaintiff, she intended to leave once this

argument erupted. Id. ¶ 12. But she delayed her departure because "her credit card was behind the bar, and her phone was on the bar countertop." Id. An off-duty female bartender pulled Plaintiff's barstool out from under her, but Plaintiff remained standing. Dkt. No. 10-2, Outerbanks Main Room Surveillance Footage at 00:15–00:18.[1] Plaintiff, the off-duty bartender, and the bar owner argued for approximately one minute longer before the off-duty bartender shoved Plaintiff. Id. at 01:13–01:14. Bar patrons pulled the two off of each other. Id. at 01:14–01:17.

Plaintiff did not retreat; instead, she advanced on the off-duty bartender with her finger pointed. Id. at 01:17–01:19. Bar patrons again tried to separate the two women and moved Plaintiff towards the exit, but Plaintiff continually walked back up to the bar to verbally engage with the bar owner as he motioned to the door. Id. at 01:20–01:45. At this point, the off-duty bartender broke free of the patrons holding her back and pushed Plaintiff once more; the bar owner then came out from behind the bar. Id. at 01:45–01:49. As Plaintiff continued to resist the patrons

---

[1] Although the Court must accept the facts in the complaint as true at the motion to dismiss stage, "where a video is clear and obviously contradicts the plaintiff's alleged facts," the Court must "accept the video's depiction instead of the complaint's account and view the facts in the light depicted by the video." Baker v. City of Madison, 67 F.4th 1268, 1277–78 (11th Cir. 2023) (citations omitted). Here, where the video footage of the altercation portrays a different version of events than Plaintiff alleges, the Court views the facts as depicted in the video. Id.

escorting her to the door, the off-duty bartender attacked Plaintiff and shoved her into a wooden booth. Dkt. No. 1 ¶ 13, Dkt. No. 10-2 at 01:49–02:07. Again, the two women were separated; Plaintiff got up from the booth as the "on-duty" bartender pointed at the door and told Plaintiff to "Get out!" Dkt. No. 10-2 at 02:08–02:12.

The bar owner then walked over to Plaintiff, opened the door to the bar's entryway, and forced her through it. Id. at 02:13–02:23. According to Plaintiff, moments later, "[the bar owner] grabbed [Plaintiff] by the hair, flung her to the floor, and struck her head, causing a concussion and ruptured eardrum." Dkt. No. 16 at 2 (citing Dkt. No. 10-3, Outerbanks Entryway Surveillance Footage at 03:15–03:30). The cited video footage does not show the bar owner striking Plaintiff in the head. See Dkt. No. 10-3 at 03:15–03:30. It does show Plaintiff fell to the ground at the hands of the bar owner and another unidentified individual and immediately got back up as the bar owner pointed to the exit door. Id. The scuffle continued in the entryway and developed into a larger fight with many patrons, but neither the bar owner nor Plaintiff are visible on this portion of the video. Id. at 03:30–03:48. When the bar owner appears on the video again, he takes action to break up the larger fight and clear out the bar. Id. at 03:49–04:34.

Just over one minute later, the Kingsland Police Department arrived. Dkt. No. 10-3 at 05:52. During this time, Plaintiff again entered the main room of the bar from the entryway as the bar owner pointed to the door while patrons held him back. Dkt. No. 10-2 at 06:48-07:06. At this point, an unidentified individual forced Plaintiff to exit. Id. This individual, followed by a non-defendant Kingsland Police Officer, escorted Plaintiff out while the bar owner frantically pointed to the door. Dkt. No. 10-3 at 05:59-06:10.

## II.  **Kingsland Police Department's Investigation of the Fight**

Several Kingsland Police Officers, including Defendant Michael Gonzalez, arrived as Plaintiff exited the bar. Dkt. No. 10-1, Officer Gonzalez Body-Worn Camera Footage at 02:27-02:42. On Defendant's body camera footage, one of the first intelligible voices is the bar owner yelling "Get out of our establishment!" Id. at 02:42-02:44. Thereafter, the non-defendant officer escorted Plaintiff to the sidewalk in front of the bar while Plaintiff continued to turn around and yell at the bar staff. Id. at 02:45-02:56. Defendant approached the bar staff and asked, "What's going on?" Id. at 03:03-03:04. The bar owner immediately told Defendant, "I told her to get out, and she was like 'blah blah blah' and I was like, 'get out of my establishment.'" Id. at 03:04-03:09. The man next to the bar owner then corroborates that "she didn't want to leave." Id. at 03:10-03:13. The bar owner told Defendant that

4

Plaintiff started a fight but then repeatedly said "I can't leave" while he insisted that Plaintiff "get out of [his] establishment." Id. at 03:14–03:30. A bartender then stated "[Plaintiff's credit] card is not on file." Id. at 03:14–03:23.

Defendant then spoke to Plaintiff as she tearfully explained that she was attacked. Id. at 03:45–05:23. Defendant repeatedly asked for her identification until she stated, "I don't have anything." Id. at 5:37. A bystander then said that "[Plaintiff] ain't hit nobody" and that she "was trying to get her ID and phone back, and they was jumping on her." Id. at 06:36–06:39. Another bystander chimed in that the bar owner was "running his mouth" and "decked her in the face" and the off-duty bartender also "decked her in the face." Id. at 07:03–07:25. This bystander also stated Plaintiff was "trying to get her card" and "trying to tab out and get out of here." Id. at 07:38–07:40. Plaintiff immediately contradicted this by saying, during this encounter, she was trying to order her next drink, and the bar owner gave her "the cold shoulder." Id. at 07:41–07:59.

Then, a woman walked out of the bar, and Plaintiff accused this woman of being one of the attackers. Id. at 08:21–08:28. The woman responded that she was just trying to get Plaintiff out of the bar. Id. at 08:28–08:30. The woman said, "You came at me." Id. at 08:31–08:40. She walked away as Plaintiff became increasingly upset, insinuating that Defendant allowed this woman to walk away

because he knew her personally. Id. at 08:58–09:08. Defendant then stated, "Do you want me to arrest you right now? You need to calm down. Calm down. You [a bystander] need to talk to her before I arrest her ass." Id. at 09:09–09:21.

Defendant then walked away from Plaintiff to go inside and watch the surveillance footage with other officers and the bar owner. Id. at 09:22–20:41. While watching the surveillance footage, the bar owner recounted that he asked Plaintiff to "please leave" while still standing behind the bar. Id. at 13:14–13:17. Defendant reviewed the surveillance video carefully, rewinding it at multiple points. See id. at 16:59, 17:55. The bar owner described the encounter as follows: "[Plaintiff] spit on [him and the off-duty bartender]. [His] employees lashed out." Id. at 20:20–20:30. The bar owner just wanted her "out of the building." Id.

Then, Defendant spoke with the off-duty bartender. Id. at 21:14. The off-duty bartender admitted to pushing Plaintiff but said she just wanted Plaintiff to "get out, get out, get out." Id. at 21:26–21:30. The off-duty bartender did not corroborate the bar owner's account that Plaintiff spit on anyone; rather, she said that Plaintiff was only "talking shit" but did not do anything "physical" to instigate the fight. Id. at 21:30–21:46.

Thereafter, Defendant returned to his patrol car and spoke with other officers. Id. at 22:52. By this point, Defendant stated that he was going to arrest Plaintiff for disorderly conduct. Id.

at 23:38-23:39. He then stated, "Let me review the statute code for trespassing because if they are already asking her or telling her to leave and she's not leaving, then we could arrest her for just trespassing." Id. at 23:43-23:55.

Defendant then confirmed with dispatch that Plaintiff had not previously been issued a criminal trespass warning ("CTW") from the Outerbanks bar. Id. at 27:21. The officers debated whether to charge her with battery for allegedly spitting on bar staff, Defendant articulated his reasons for the trespass charge, and Defendant declined to charge her with public intoxication or battery. Id. at 29:01-30:34. Defendant then stated that he intended to cite the off-duty bartender for her role in the altercation based on Defendant's review of the video. Id. at 30:35-31:05.

### III. Plaintiff's Arrest

Shortly thereafter, Plaintiff approached the patrol car tearfully asking to have photographs of her head taken and seeking access to the surveillance footage. Id. at 35:00-35:22. As Defendant exited his car and attempted to speak with her, Plaintiff clapped her hands at him and stated "No, stop. You listen to me. I have a right to speak." Id. at 35:23-35:35. Defendant immediately arrested Plaintiff and instructed other officers to place her in the back of a patrol car. Id. at 35:35-36:13. Defendant charged Plaintiff with trespassing and disorderly conduct. Dkt. No. 16 at 3. Defendant's police report omitted the bystander's accounts of

Plaintiff being assaulted and favored the bar staff members' versions of the events "despite their inconsistencies." Dkt. No. 1 ¶¶ 20, 33.

Post-arrest, Defendant stated, "[Plaintiff] should have just [] shut the fuck up." Dkt. No. 10-1 at 44:40-44:45. Another officer noted Plaintiff's "aggressive gestures" towards Defendant, and Defendant responded, "And, yeah, telling me 'no' and to 'be quiet,' no. I ain't having that." Id. at 44:46-44:51. Before leaving the scene, Defendant cited the off-duty bartender for the "city ordinance for fighting," which he described to her as a "slap on the hand." Id. at 47:16-48:15.

That night, Defendant booked Plaintiff into the Camden County Detention Center, where she was held for several hours before she posted bail. Dkt. No. 1 ¶ 8. The morning after her arrest, a local news outlet published Plaintiff's booking photograph. Id. "Plaintiff's church later banned her from all service positions and excommunicated her from certain circles within the church." Id. Further, "Plaintiff was blocked from picking her stepson up from school, and the mother of Plaintiff's stepson initiated legal action to permanently change and limit the prior shared custody arrangement." Id. On April 5, 2023, Plaintiff's charges were dismissed. Id.

8

## IV.  Plaintiff's Present Suit

On November 5, 2024, Plaintiff brought this action. <u>See</u> Dkt. No. 1. Plaintiff asserts, pursuant to 42 U.S.C. § 1983, a First Amendment retaliatory arrest claim and a Fourth Amendment unlawful seizure claim. <u>Id.</u> at 9, 13. Plaintiff also alleges two state law claims for "Negligent Investigation/Drafting Police Report" and, in the alternative, "Malicious Investigation/Drafting Police Report." <u>Id.</u> at 15, 17.

### LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this pleading standard does not require "detailed factual allegations," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 570). A claim is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u>

In deciding whether a complaint states a claim for relief, the Court must accept the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1347 (11th Cir. 2016) (citing Ironworkers Local Union 68 v. AstraZeneca Pharms., LP, 634 F.3d 1352, 1359 (11th Cir. 2011)). The Court should not accept allegations as true if they merely recite the elements of the claim and declare that they are met. Iqbal, 556 U.S. at 678–79.

While the factual allegations set forth in the complaint are to be considered true at the motion to dismiss stage, the same does not apply to legal conclusions set forth in the complaint. Id. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. The Court need not "accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Thus, a complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282–83 (11th Cir. 2007) (per curiam) (quoting Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)). Ultimately, if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but

it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

"Under the incorporation-by-reference doctrine, a court may consider evidence attached to a motion to dismiss without converting the motion into one for summary judgment if (1) 'the plaintiff refers to certain documents in the complaint,' (2) those documents are 'central to the plaintiff's claim,' and (3) the documents' contents are undisputed." Baker, 67 F.4th at 1276 (citations omitted). This doctrine applies to "various types of documentary evidence" including body camera footage. Id.

**DISCUSSION**

Defendant moves for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Dkt. No. 10. First, Defendant moves to dismiss Plaintiff's claims arising under federal law because the existence of probable cause bars First and Fourth Amendment claims and deploys the shield of qualified immunity. Id. at 9, 12. Second, Defendant moves to dismiss Plaintiff's claims arising under Georgia law because Plaintiff fails to identify the source of the state-law duties allegedly breached by Defendant. Id. at 15.

**I.   Plaintiff's Constitutional Claims**

**A.   Qualified Immunity Framework**

"Qualified immunity is a defense not only from liability, but also from suit, so courts should ascertain the validity of a

11

qualified immunity defense as early in the lawsuit as possible." Gilmore v. Hodges, 738 F.3d 266, 272 (11th Cir. 2013); see also Ledea v. Metro-Dade Cnty. Police Dep't, 681 F. App'x 728, 729 (11th Cir. 2017) ("Qualified immunity is an affirmative defense to personal liability that can be asserted on a pretrial motion to dismiss under Rule 12(b)(6) for failure to state a claim." (citing Skritch v. Thornton, 280 F.3d 1295, 1306 (11th Cir. 2002))).

When successfully invoked, qualified immunity shields from civil liability government officials who perform discretionary functions. Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity allows "government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." Durruthy v. Pastor, 351 F.3d 1080, 1087 (11th Cir. 2003) (citation omitted). It shields "all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted).

"An official asserting the affirmative defense of qualified immunity must initially establish that he was acting within the scope of his discretionary authority, and the burden then shifts to the plaintiff to show that the official is not entitled to qualified immunity." Ledea, 681 F. App'x at 729 (citing Skop v. City of Atlanta, 485 F.3d 1130, 1136–37 (11th Cir. 2007)). Once

the burden shifts, the plaintiff must show that (1) the defendant violated a constitutional right; and (2) the right was clearly established at the time of the alleged violation. Id. Qualified immunity will shield the defendant official from civil liability if a plaintiff fails either prong of the analysis. Underwood v. City of Bessemer, 11 F.4th 1317, 1328 (11th Cir. 2021) (citing Pearson v. Callahan, 555 U.S. 223, 242 (2009)).

First, discretionary authority covers "all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." Hinson v. Bias, 927 F.3d 1103, 1116 (11th Cir. 2019) (quoting Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994)). It is well-settled that making an arrest is a legitimate, authorized function of a police officer's job responsibilities. See, e.g., Valentine v. Robinson, 601 F. App'x 778, 781 (11th Cir. 2015) (concluding that "the general act of arresting a suspect is clearly part of Defendants' job-related powers and responsibilities" (citing Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004))). Thus, Defendant engaged in a discretionary function when he arrested Plaintiff.[2]

Next, after a defendant official establishes that his relevant conduct fell within his discretionary authority,

---

[2] Plaintiff does not dispute that Defendant acted within his discretionary authority. See generally Dkt. Nos. 16, 18, 19.

qualified immunity will shield the defendant official from liability "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). To be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

The Court must now determine whether the facts—viewed in the light most favorable to Plaintiff—"show the officer's conduct violated a constitutional right" under the First and Fourth Amendments, and if so, whether that right was clearly established. Saucier v. Katz, 533 U.S. 194, 201 (2001); see also Hope v. Pelzer, 536 U.S. 730, 736 (2002) ("The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation."); Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (citing Scott v. Harris, 550 U.S. 372, 377 (2007)). If not, qualified immunity shields Defendant from liability.

**B.   Plaintiff's First Amendment Claim**

The First Amendment protects "a significant amount of verbal criticism and challenge directed at police officers." City of

Houston v. Hill, 482 U.S. 451, 461 (1987). Accordingly, a law enforcement officer cannot arrest a person merely for engaging in constitutionally protected speech. Merenda v. Tabor, 506 F. App'x 862, 868 (11th Cir. 2013) (citing Gooding v. Wilson, 405 U.S. 518, 521–22 (1972)).

To state a § 1983 First Amendment retaliation claim, a plaintiff must plausibly allege (1) her speech was constitutionally protected, (2) the defendant's retaliatory conduct adversely affected the protected speech, and (3) there is a causal connection between the retaliatory conduct and the protected speech. DeMartini v. Town of Gulf Stream, 942 F.3d 1277, 1289 (11th Cir. 2019). Under the third element, "the Supreme Court has instructed that a plaintiff must plead and prove the absence of probable cause for the arrest." Turner v. Williams, 65 F.4th 564, 581 (11th Cir. 2023).[3] Assuming the first two prongs are met,

_____

[3] The Court uses the probable cause standard (rather than the arguable probable cause standard) for the First Amendment analysis because the Eleventh Circuit's most recent *published* opinions do so. Compare DeMartini, 942 F.3d at 1294–95 (11th Cir. 2019) (holding, in § 1983 First Amendment retaliatory arrest cases, "the presence of probable cause will typically invalidate a First Amendment retaliatory arrest claim" without mentioning arguable probable cause); Turner, 65 F.4th at 581 ("In view of the 'but-for' cause requirement for a First Amendment retaliatory arrest claim, the Supreme Court has instructed that a plaintiff 'must plead and prove the absence of probable cause for the arrest'" without mentioning arguable probable cause (citations omitted)) with Watkins v. Bigwood, No. 22-10875, 2023 WL 3711827, at *4 (11th Cir. May 30, 2023) (per curiam) ("Because the officers here had arguable probable cause to arrest [the plaintiff], we likewise conclude that they are entitled to qualified immunity from [the]

the parties' arguments focus on whether the existence of probable cause defeats the third prong and, if so, whether an exception—which makes the probable cause inquiry irrelevant—applies. See Dkt. Nos. 10, 16, 17, `9.

**1. Probable Cause**

Generally, probable cause defeats a retaliatory arrest claim. Nieves v. Bartlett, 587 U.S. 391, 406 (2019). "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010) (citing Madiwale v. Savaiko, 117 F.3d 1321, 1324 (11th Cir. 1997)).

Here, Plaintiff's complaint states that "[n]o reasonable officer in Defendant's position could have believed there was probable cause that [Plaintiff] committed the offense of disorderly conduct, trespassing, or any other criminal act prior to her arrest." Dkt. No. 1 ¶ 70; see also id. ¶ 57. Importantly, however, the parties agree that the Court should consider the body camera footage and surveillance footage at this stage. See

---

First Amendment retaliation claim."); Gaston v. City of Leesburg, No. 24-10276, 2025 WL 252437, at *1-2 (11th Cir. Jan. 21, 2025) (per curiam) (same).

generally Dkt. Nos. 10, 16, 18; see also Baker, 67 F.4th at 1276.[4]
Accordingly, if, after viewing the clear video and drawing all
inferences in Plaintiff's favor, the Court finds there was
nevertheless probable cause, then, Plaintiff's claim cannot
withstand the motion to dismiss.

### a. Criminal Trespass

In Georgia, a person commits the offense of criminal trespass
"when he or she knowingly and without authority . . . [r]emains
upon the land or premises of another person . . . after receiving
notice from the owner, rightful occupant, or, upon proper
identification, an authorized representative of the owner or
rightful occupant to depart." O.C.G.A. § 16-7-21(b)(3). "To be
guilty of criminal trespass, a person who has been advised to leave
must be given a reasonable amount of time to do so." Pressley v.
State, 603 S.E.2d 699, 701 (Ga. Ct. App. 2004). The notice to leave
must also "be reasonable under the circumstances, as well as
sufficiently explicit to apprise the trespasser what property
[she] is forbidden to enter." Kopperud v. Mabry, 573 F. App'x 828,
831 (11th Cir. 2014) (quoting Rayburn v. State, 300 S.E.2d 499,
500 (Ga. 1983)).

---

[4] Plaintiff cites the body camera footage and surveillance video
in the complaint. Dkt. No. 1 ¶¶ 13-14, 18-19. She does not
challenge its authenticity. See Dkt. Nos. 16, 18. It depicts the
events central to her claim; specifically, it depicts her conduct
before the arrest. See Dkt. Nos. 10-1, 10-2, 10-3.

Plaintiff's account of the altercation is as follows: The bar owner made a derogatory comment; Plaintiff "responded and then attempted to leave." Dkt. No. 1 ¶¶ 11–12. "However, her credit card was behind the bar, and her phone was on the bar countertop." Id. ¶ 12. While "attempting to obtain her things," the off-duty bartender and the bar owner "attacked" Plaintiff. Id. ¶¶ 13–14. At its core, Defendant's argument is that the body camera and surveillance footage cited in the complaint contradict Plaintiff's allegations and support a finding of probable cause. See Dkt. No. 10. Defendant is correct.

The videos plainly establish probable cause. One of the first clearly audible things on the body camera footage is "Get out of our establishment!" Dkt. No. 10-1 at 02:43–02:45. One of the first things Defendant is told on the scene is that the bar owner "told [Plaintiff] to get out" and repeated "get out of my establishment." Id. at 03:05–03:13. The bar owner then explained that Plaintiff refused to leave. Id. at 03:15–03:32.

Then, Defendant thoroughly reviewed the surveillance footage of the bar while being told by the bar owner that Plaintiff was repeatedly asked to leave and spit in his face. Id. at 09:33–20:40. Defendant also spoke to the off-duty bartender. Id. at 21:30–21:46. The off-duty bartender did not corroborate that Plaintiff spit in anyone's face but nevertheless reiterated the

narrative that the bar staff repeatedly asked Plaintiff to leave. Id.

The attached surveillance footage shows that Plaintiff, after the altercation with the off-duty bartender, remained in the bar as the bar staff pointed to the door. Dkt. No. 10-2 at 02:08–02:16. The video clearly shows that the bar owner walked over to Plaintiff, pointed to the door, opened it for Plaintiff, and physically forced her out of the main room into the front entryway of the bar. Id. at 02:17–02:25. In the following minutes, the video shows Plaintiff standing in the entryway as the bar owner pointed to the exit door. Dkt. No. 10-3 at 03:15–03:30. Then, Plaintiff entered the main room again, on her own volition, as the bar owner pointed to the door. Dkt. No. 10-2 at 06:48. Bar patrons and employees physically separated Plaintiff from others and forced her out again. Id. at 06:49–07:05.

Finally, after over six minutes, Plaintiff left once the law enforcement officers arrived. Dkt. No. 10-3 at 6:04–6:06. As she left, the bar owner continued to shout and point to the door. Id. at 6:07–6:09. After viewing this footage, a reasonable officer could believe that Plaintiff remained in the bar after receiving notice to leave, resisted the patrons and bar staff physically moving her towards the door, and had reasonable opportunity to leave. See Dkt. Nos. 10-1, 10-2. Indeed, the surveillance footage

shows several points where the pushing and shoving stops, and Plaintiff has ample time to leave.

After carefully reviewing the footage and speaking to the off-duty bartender, Defendant returned to his patrol car and stated to the other officers, "Let me review the statute code for trespassing because if they are already asking her or telling her to leave and she's not leaving, then we could arrest her for just trespassing." Id. at 23:43–23:55.[5] This determination has nothing to do with Plaintiff's speech.

In sum, the facts known to Defendant at the time of the arrest support that, instead of retreating or taking her conflict with bar staff outside the establishment, Plaintiff refused to leave after the bar owner repeatedly told her to depart. Although the off-duty bartender fights Plaintiff during this time, the videos show several moments where Plaintiff was not physically restrained and could have left the bar. The video evidence indisputably shows that Plaintiff refused to leave over the course of nearly seven minutes while the bar staff pointed to the door.

Plaintiff focuses on statements from Defendant's body camera footage, such as "[Plaintiff] should have just shut the fuck up" and Defendant telling Plaintiff to "calm down" and telling a

---

[5] In so noting, the Court does not consider Defendant's subjective belief but rather uses this point in time in the body camera footage as the moment probable cause is established after nearly twenty minutes of investigation.

bystander to talk to Plaintiff "before I arrest her ass," to assert that Defendant retaliated against her protected speech. Dkt. No. 1 ¶¶ 22, 30. But, subjective beliefs and "intentions play no role in ordinary, probable-cause" analysis. Whren v. United States, 517 U.S. 806, 813 (1996). "Probable cause is an objective standard." Gill v. Judd, 941 F.3d 504, 517 (11th Cir. 2019). The issue is not whether the body camera footage shows that Defendant was irritated by Plaintiff's persistent, but constitutionally protected, speech after the arrest but whether a reasonable officer would have believed probable cause for trespass existed at the time of the arrest. The undisputed video evidence shows that Plaintiff was not arrested for her speech; she was arrested because the objective facts show that Plaintiff remained inside the bar after receiving notice from the owner to depart and having several minutes to retreat.

Viewing the video footage in the light most favorable to Plaintiff, the facts amply support probable cause to believe Plaintiff stayed in the bar "after receiving notice from the owner . . . to depart." O.C.G.A. § 16-7-21(b)(3). Under Georgia law, there is no exception to trespass after an altercation or when one's belongings are still inside the establishment. Even at this early stage, the existence of probable cause bars a retaliatory arrest claim as a matter of law absent an exception.

### b. Disorderly Conduct

#### i.    The Any-Crime Rule

Having established that Defendant possessed probable cause to arrest Plaintiff for trespass, the Court notes that Defendant also charged Plaintiff with disorderly conduct. Dkt. No. 16 at 3. Plaintiff briefly argues that it is significant that Defendant's motion addresses probable cause for trespass only, rather than disorderly conduct. Id. at 7 n.1.

The "any-crime" rule "insulates officers from false-arrest claims so long as probable cause existed to arrest the suspect for some crime, even if it was not the crime the officer thought or said had occurred." Williams v. Aguirre, 965 F.3d 1147, 1158 (11th Cir. 2020). "So long as the circumstances known to the officers, viewed objectively, give probable cause to arrest for any crime, the arrest is constitutionally valid even if probable cause was lacking as to some offenses, or even all announced charges." Elmore v. Fulton Cnty. Sch. Dist., 605 F. App'x 906, 914 (11th Cir. 2015) (per curiam) (citing Devenpeck v. Alford, 543 U.S. 146, 153-55 (2004), then citing Lee, 284 F.3d at 1195-96).

The Eleventh Circuit has never explicitly held that this "any-crime rule" applies to First Amendment retaliation claims. Nevertheless, the reasoning of district courts in the Eleventh Circuit guides the Court to apply the any-crime rule to this case. "When defining the contours of a claim under § 1983," the Court

must "look to 'common-law principles that were well settled at the time of its enactment.'" Nieves, 587 U.S. at 405. But "when § 1983 was enacted in 1871, there was no common law tort for retaliatory arrest based on protected speech." Id. Thus, the Court considers whether this case is more analogous to the common-law tort of malicious prosecution, to which the any-crime rule does not apply, or more like the common-law tort of false arrest, to which the any-crime rule applies. See id.; Thompson v. Clark, 596 U.S. 36, 43 (2022); Manuel v. City of Joliet, 580 U.S. 357, 370 (2017); Williams, 965 F.3d at 1158.

The difference between these two common-law torts is whether the injury arises out of "the suit or proceeding" or the detention itself. Thompson, 596 U.S. at 44 (citing T. Cooley, Law of Torts 181 (1880)). In 1871, "[t]he malicious prosecution tort protected against injury to the person, as connected with false imprisonment and against a wrong to character or reputation" while the tort of false arrest protected against "every confinement of the person, including one effected by forcibly detaining someone in the public streets." Id. at 43-44 (citing Cooley, supra, at 180); 1 F. Hilliard, The Law of Torts or Private Wrongs 412-14 (1866)); id. at 53 (Alito, J., dissenting) (alterations adopted) (internal quotation marks omitted) (quoting Wallace v. Kato, 549 U.S. 384, 388-89 (2007)).

23

Where the defendant initiates a criminal prosecution to retaliate against a plaintiff's speech, such conduct is analogous to a malicious prosecution claim to which the any-crime rule does not apply. See O'Boyle v. Town of Gulf Stream, No. 19-80196, 2022 WL 866756, at *17 n.8 (S.D. Fla. Jan. 25, 2022), amended by 2022 WL 866746, at *1 (Feb. 17, 2022), aff'd, No. 22-10865, 2023 WL 2579134, at *6 (11th Cir. Mar. 21, 2023), cert. denied sub nom., 144 S. Ct. 486 (2023). But, where the retaliation is more analogous to a false arrest, courts have held the any-crime rule applies. See Carder v. Phillips, No. 2:22-CV-00200, 2023 WL 10675296, at *12 (N.D. Ga. Aug. 18, 2023) (applying the any-crime rule to a First Amendment retaliatory arrest claim); Pinto v. Rambosk, No. 2:19-CV-551, 2021 WL 3406253, at *6 (M.D. Fla. Aug. 4, 2021), aff'd sub nom. Pinto v. Collier Cnty., No. 21-13064, 2022 WL 2289171 (11th Cir. June 24, 2022); Brienza v. City of Peachtree City, Ga., No. 21-12290, 2022 WL 3841095, at *7 (11th Cir. Aug. 30, 2022); see also Hartman v. Thompson, 931 F.3d 471, 483 (6th Cir. 2019) (holding probable cause was established for one crime and did not analyze whether probable cause existed for the disorderly conduct charge); Brown v. Guinee, No. 22-15426, 2023 WL 4422302, at *1 (9th Cir. July 10, 2023) ("[A]lthough [plaintiffs] were arrested for trespassing and not disorderly conduct, probable cause to arrest them for the closely related offense of disorderly conduct defeats their retaliatory arrest claim because the probable cause

24

is based on the same conduct underlying the trespassing arrest." (internal quotation marks and citation omitted)). Accordingly, where a warrantless arrest is the retaliatory action, the Eleventh Circuit's application of the any-crime rule to false arrest cases controls the Court's analysis. See Williams, 965 F.3d at 1162 ("For a warrantless arrest, an arrested individual is no more seized when he is arrested on several grounds rather than one, so the only question relevant to the objective reasonableness of a seizure is whether probable cause for *some* crime exists." (internal quotation marks and citation omitted) (alterations adopted) (emphasis in original)).

In this case, Plaintiff challenges her arrest on the scene and brief detention in the Camden County Detention Center, not her prosecution. Dkt. No. 1 ¶ 8. Therefore, Defendant's probable cause for trespass defeats Plaintiff's First Amendment claim because probable cause constitutionally justified the arrest; the arrest was not unjustifiably based on Plaintiff's speech. Assuredly, the Court's holding does not endorse officers "loading the wagon" with charges merely because "any crime" can be charged if there is probable cause as to at least one. Instead, the Court cabins its holding to cases where the First Amendment claim is analogous to a false arrest claim, rather than a malicious prosecution claim, because the Eleventh Circuit unequivocally holds that the any-

crime rule applies to false arrest claims. See Williams, 965 F.3d at 1162.

### 2. The Nieves Exception

Plaintiff argues, in the alternative, that if the Court finds there is probable cause, the Nieves exception covers this case. Dkt. No. 16 at 6. That is, even though Defendant had probable cause to arrest Plaintiff, Plaintiff's First Amendment claim may still survive the motion to dismiss if the so-called Nieves exception applies. The presence of probable cause does not defeat a First Amendment retaliation claim "when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." Nieves, 587 U.S. at 407.

"To fall within the exception, a plaintiff must produce evidence to prove that his arrest occurred" under "circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." Gonzalez v. Trevino, 602 U.S. 653, 658 (2024) (per curiam) (quoting Nieves, 587 U.S. at 406). "Because this inquiry is objective, the statements and motivations of the particular arresting officer are 'irrelevant' at this stage." Nieves, 587 U.S. at 407 (quoting Devenpeck, 543 U.S. at 153).

Instead, "such objective evidence could include officers' employment of an unusual, irregular, or unnecessarily onerous

arrest procedure, as well as the timing of and events leading up to a plaintiff's arrest." Trevino, 602 U.S. at 676 (Jackson, J., concurring) (noting that "the lower courts may consider the full scope of objective evidence that [the plaintiff] offered to establish differential treatment"). "Similarly, if officers falsely document the arrest or include other indicia of retaliatory motive in arrest-related documents, that too might suggest meaningfully differential treatment." Id. Lastly, in Trevino, the Court held that a survey showing that, in the last decade, no one charged with the crime for which the plaintiff was arrested had engaged in conduct similar to hers could be the sort of objective evidence to satisfy Nieves. Id. at 658. The Nieves exception is narrow, but it does not require a plaintiff to identify "virtually identical and identifiable comparators" who were not arrested. Id.

If a plaintiff makes this showing, her claim "may proceed in the same manner as claims where the plaintiff has met the threshold showing of the absence of probable cause." Nieves, 587 U.S. at 407–08 (citation omitted). Defendant argues the Nieves exception does not apply because this law was not clearly established at the time of Plaintiff's arrest. Dkt. No. 17 at 6. Defendant further asserts that the facts of this case do not clearly satisfy the exception. Id. at 7.

**a. The <u>Nieves</u> exception was not clearly established.**

Plaintiff's arrest occurred on November 24, 2022. Dkt. No. 1 ¶ 8. At the time Plaintiff was arrested, the Eleventh Circuit acknowledged the <u>Nieves</u> exception was dicta. <u>DeMartini</u>, 942 F.3d at 1296. It is well-settled that "dicta cannot clearly establish the law for qualified immunity purposes." <u>Jones v. Cannon</u>, 174 F.3d 1271, 1288 n.11 (11th Cir. 1999) (citing <u>Hamilton v. Cannon</u>, 80 F.3d 1525, 1530 (11th Cir. 1996), then citing <u>Adams v. St. Lucie Cnty. Sheriff's Dep't</u>, 962 F.2d 1563, 1575 (11th Cir. 1992) (Edmondson, J., dissenting) (even Supreme Court dicta cannot clearly establish the law for qualified immunity purposes), <u>adopted en banc</u>, 998 F.2d 923 (11th Cir. 1993)).

<u>DeMartini</u>, itself, did not clearly establish the <u>Nieves</u> exception for two reasons. First, the <u>DeMartini</u> opinion does not adopt the <u>Nieves</u> exception as the law of the Eleventh Circuit. 942 F.3d at 1296. Instead, its "recap" of the law did not contradict the earlier coloration of the <u>Nieves</u> exception as Supreme Court dicta nor proclaim it the law of the Eleventh Circuit. <u>Id.</u> at 1297. Indeed, Judge Rosenbaum wrote separately to address her concern that the <u>DeMartini</u> opinion "might be understood to suggest that probable cause [] may be all that is ever required to defeat a § 1983 First Amendment retaliation claim." <u>Id.</u> at 1311 (Rosenbaum, J., concurring). That she had to clarify shows that the majority

opinion did not clearly carve out this exception as the settled law of the Eleventh Circuit.

Second, "regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case." Edwards v. Prime Inc., 602 F.3d 1276, 1298 (11th Cir. 2010) (collecting cases). The facts of DeMartini did not implicate the Nieves exception, and as such, the Eleventh Circuit did not go on to apply Nieves to the facts of the case. See, e.g., United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000) ("The holdings of a prior decision can reach only as far as the facts and circumstances presented to the Court in the case which produced that decision."); United States v. Gillis, 938 F.3d 1181, 1198 (11th Cir. 2019) ("[D]icta is a statement that neither constitutes the holding of a case, nor arises from a part of the opinion that is necessary to the holding of the case. Stated another way, dicta is defined as those portions of an opinion that are not necessary to deciding the case then before us." (internal quotation marks and citations omitted)).

The DeMartini decision did not depend on, nor even involve, an application of the Nieves exception by analyzing comparators who were not arrested. Thus, the articulation of the Nieves exception in DeMartini was merely an acknowledgment of its existence and nonessential to the DeMartini holding. See, e.g., Wells v. Union City, No. 1:21-cv-05035, 2024 WL 3819839, at *5

29

(N.D. Ga. July 9, 2024) (finding the <u>Nieves</u> exception was not clearly established until at least 2023); <u>Cooley v. Woods</u>, 642 F. Supp. 3d 1363, 1376 (N.D. Ga. 2022) (referring to the <u>Nieves</u> exception as dicta in November 2022). Binding case law did not clearly establish the <u>Nieves</u> exception as the law of this Circuit until nearly six months after Plaintiff's arrest—when the Eleventh Circuit decided <u>Turner</u> on April 7, 2023. 65 F.4th at 586.[6]

   **b. Even if the <u>Nieves</u> exception was clearly established, Plaintiff does not adequately allege that similarly situated individuals were not arrested.**

Even if the <u>Nieves</u> exception was clearly established in November 2022, Plaintiff fails to show that similarly situated individuals were not arrested. Instead, Plaintiff argues that animus towards Plaintiff is shown by the fact that the off-duty bartender and the bar owner were not charged with assault or battery for the physical altercation. Dkt. Nos. 1 ¶¶ 13–14, 90, 16 at 7. This argument fails for two reasons.

First, Defendant charged the off-duty bartender for her role in the fight. Defendant's decision to do so makes this case unfit for the "slim" <u>Nieves</u> exception which applies only "where officers

---

[6] In her post-hearing supplemental brief, Plaintiff argues "other Circuits have found that the <u>Nieves</u> exception was clearly established law by November of 2022." Dkt. No. 19 at 1 (citing <u>Ballentine v. Tucker</u>, 28 F.4th 54, 67 (9th Cir. 2022); <u>Lund v. City of Rockford</u>, 956 F.3d 938, 945 (7th Cir. 2020)). But, "a decision from one of [the Eleventh Circuit's] sister circuits 'cannot provide "clearly established" law in this Circuit.'" <u>Jackson v. McCurry</u>, 762 F. App'x 919, 928 (11th Cir. 2019) (quoting <u>Loftus v. Clark-Moore</u>, 690 F.3d 1200, 1206 (11th Cir. 2012)).

have probable cause to make arrests, but typically exercise their discretion not to do so." Trevino, 602 U.S. at 658. Merely alleging that Defendant showed the off-duty bartender "preferential treatment" does not equate to an allegation that Defendant exercised his discretion to arrest only Plaintiff "when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been" arrested. Nieves, 587 U.S. at 407.

Although Plaintiff correctly asserts that Defendant told the bartender that the citation was a "slap on the hand," dkt. no. 10-1, 47:24-48:15, the Court must look to the objective evidence; "the statements and motivations of the particular arresting officer are 'irrelevant' at this stage." Nieves, 587 U.S. at 407; see also DeMartini, 942 F.3d at 1297 (Under the Nieves exception, the plaintiff must present objective evidence "that non-retaliatory reasons prompted the arrest and avoid a subjective inquiry into the officer's individual statements and motivations."); Turner, 65 F.4th at 581 ("Because a state of mind is easy to allege and hard to disprove, a subjective inquiry would threaten to set off broad-ranging discovery in which there often is no clear end to the relevant evidence." (internal quotation marks and citation omitted)). Despite Plaintiff's urging for the Court to heed Justice Gorsuch's "hope that lower courts will apply [the Nieves] decision 'commonsensically,'" that commonsensical approach was not the decision of the majority nor has it been

adopted by the Eleventh Circuit. <u>Nieves</u>, 587 U.S. at 419 (Gorsuch, J., concurring in part and dissenting in part); <u>see also</u> Dkt. No. 19 at 2. Thus, it is not the standard to which Defendant is held.

Second, "similarly situated" in this context means "committing the same conduct." <u>DeMartini</u>, 942 F.3d at 1297. Plaintiff has not shown, nor attempted to show, that anyone else was asked to leave the bar but refused to do so. At most, Plaintiff quotes another officer's footage, that is not attached to Defendant's motion to dismiss, in which a non-defendant-officer states, "We was fixing to write everybody a citation . . . Her coming over here and starting up–we're going to take her to jail for that." Dkt. No. 1 ¶ 31 (citing Nordquist Body Camera at 1:45– 2:04). Even accepting that statement as true, Plaintiff fails to present objective evidence of any similarly situated individuals who committed the same conduct as Plaintiff—that is, overstayed their welcome at the bar in violation of Georgia's criminal trespass law. While Plaintiff does not need "identical" comparators, she has not alleged there are any comparable trespassers who were not arrested. <u>Trevino</u>, 602 U.S. at 658. Therefore, even if the <u>Nieves</u> exception was clearly established, Plaintiff's claim fails.

In conclusion, dismissal of Plaintiff's First Amendment claim is warranted because the facts viewed in the light most favorable to Plaintiff show that Defendant had probable cause to arrest her.

Plaintiff has not adequately alleged that Defendant retaliated against Plaintiff for the exercise of her First Amendment rights. Thus, the facts do not support a constitutional violation, and the motion to dismiss Plaintiff's First Amendment retaliation claim is **GRANTED**.

### C. Plaintiff's Fourth Amendment Claim

"To succeed on a false arrest claim, a plaintiff must establish (1) a lack of probable cause and (2) an arrest." Richmond v. Badia, 47 F.4th 1172, 1180 (11th Cir. 2022). "Accordingly, when the government has probable cause to arrest someone, a false arrest claim necessarily fails." Id. (citing Crocker v. Beatty, 995 F.3d 1232, 1245 (11th Cir. 2021)). Unlike the First Amendment claim, "to establish the defense of qualified immunity for a false arrest claim," the Eleventh Circuit unequivocally holds "an officer need not have actual probable cause, but only 'arguable' probable cause." Garcia v. Casey, 75 F.4th 1176, 1186 (11th Cir. 2023) (quoting Brown, 608 F.3d at 734) (internal citation omitted).

"An officer has arguable probable cause if 'a reasonable officer, looking at the entire legal landscape at the time of the arrests, could have interpreted the law as permitting the arrests.'" Id. (quoting District of Columbia v. Wesby, 583 U.S. 48, 68 (2018)). "An officer lacks arguable probable cause only if the state of the law on the date of the alleged misconduct makes it obvious that the officer's acts violated the plaintiff's rights

in the specific set of circumstances at issue." Id. (alterations adopted) (internal quotation marks omitted) (quoting Washington v. Howard, 25 F.4th 891, 903 (11th Cir. 2022)). "Accordingly, 'the dispositive question is whether it was already clearly established, as a matter of law, that at the time of Plaintiff's arrest, an objective officer could not have concluded reasonably that probable cause existed to arrest Plaintiff under the particular circumstances Defendant[] confronted.'" Id. (quoting Gates v. Khokhar, 884 F.3d 1290, 1303 (11th Cir. 2018)).

The bar owner's account of events, as recorded on Defendant's body camera footage, and the surveillance video, which Defendant thoroughly reviewed, demonstrate that Defendant had arguable probable cause to believe that Plaintiff would not leave the bar after being asked to leave. See Dkt. Nos. 10-1, 10-2.[7] Importantly, the surveillance video does *not* show Plaintiff attempting to leave at any point. Dkt. No. 10-2. The Court would need to rely on "visible fiction" to hold that Defendant could watch the footage and conclude that Plaintiff merely tried to "tab out and get out" during the nearly seven minutes in which she engaged in the verbal altercation and resisted the bar owner as he forcibly moves her

---

[7] Again, Plaintiff cites the undisputed body camera footage and surveillance video in the complaint. Dkt. No. 1 ¶¶ 13-14, 18-19. She does not challenge its authenticity. See Dkt. Nos. 16, 18. Further, it depicts the events central to her claim. See Dkt. Nos. 10-1, 10-2, 10-3.

towards the exit while pointing to the exit door. <u>Baker</u>, 67 F.4th at 1278; Dkt. Nos. 10-2, 10-3. Accordingly, the surveillance video and the body camera footage establish a reasonable officer would have arguable probable cause to believe the owner gave Plaintiff notice to depart and she remained inside the establishment for an unreasonable amount of time.

Therefore, Defendant's probable cause for trespass defeats Plaintiff's Fourth Amendment claim. The facts, viewed in the light most favorable to Plaintiff, do not show that Defendant's conduct violated a constitutional right. Thus, Defendant is entitled to qualified immunity, and his motion to dismiss Plaintiff's Fourth Amendment claim is **GRANTED.**

## II.  State Law Claims

After holding that dismissal of the First and Fourth Amendment claims against Defendant—the only federal claims in this action—is warranted, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims which lack an independent jurisdictional basis. <u>See</u> 28 U.S.C. § 1367(c)(3) (permitting a court to decline exercising supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction"); <u>see also</u> <u>Raney v. Allstate Ins. Co.</u>, 370 F.3d 1086, 1088-89 (11th Cir. 2004) ("The decision to exercise supplemental jurisdiction over pendant state claims rests within the discretion of the district court. We have encouraged district

courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." (internal citations omitted)); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").

The Court, therefore, **DISMISSES without prejudice** Plaintiff's state law claims. See Carnegie-Mellon Univ., 484 U.S. at 350 ("[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." (citing Mine Workers v. Gibbs, 383 U.S. 715, 726-27 (1966)) (footnote omitted)); see also Smith v. Franklin Cnty., 762 F. App'x 885, 891 n.3 (11th Cir. 2019) (affirming the district court's dismissal of state law claims without prejudice after it granted summary judgment on the federal claims).

## CONCLUSION

For these reasons, Defendant's motion to dismiss, dkt. no. 10, is **GRANTED.** Plaintiff's First and Fourth Amendment claims are **DISMISSED with prejudice**, and Plaintiff's state law claims are

36

**DISMISSED without prejudice**. There being no claims remaining, the Clerk is **DIRECTED to CLOSE** this case.

    **SO ORDERED** this 27th day of June, 2025.

 

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA